IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| KENNETH MILBERGER and<br>HEATHER OLSEN,<br><br>        Plaintiffs,<br><br>    v.<br><br>KBHL, LLC dba KAANAPALI BEACH<br>HOTEL; C & SEA OCEAN SPORTS;<br>COUNTY OF MAUI; JOHN/JANE DOES,<br>DOE COMPANIES, DOE PARTNERSHIPS,<br>DOE CORPORATIONS AND/OR OTHER<br>DOE ENTITIES 1-250,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civ. No. 05-00297 ACK/KSC |

ORDER GRANTING DEFENDANTS' PARTIAL MOTION
FOR SUMMARY JUDGMENT AND DISMISSING PLAINTIFF
OLSEN'S CLAIM FOR GROSS NEGLIGENCE

PROCEDURAL BACKGROUND

On April 28, 2005, Kenneth Milberger and Heather

Olsen[1]("Plaintiffs") filed a Complaint in this Court against

KBHL, LLC, dba Kaanapali Beach Hotel; C & Sea Ocean Sports;[2]

_____

[1] In the original complaint, Plaintiff Olsen's surname was
spelled "Olson".  In subsequent filings, including Plaintiffs'
Memorandum in Opposition to Defendants' Motion for Partial
Summary Judgment, her name has been spelled "Olsen".

[2] Defendant C & Sea Ocean Sports, Inc., was initially
identified as Trilogy Ocean Sports in the Complaint. A correction
was entered on June 23, 2005.

1

Kaanapali Beach Resort Association, Inc.; the County of Maui; and John/Jane Doe Entities(hereinafter collectively referred to as "Defendants").  Plaintiffs' Complaint alleged:

(I) KBHL, LLC, dba Kaanapali Beach Hotel, and C & Sea Ocean Sports negligently invited Plaintiffs to enter the waters fronting the Kaanapali Beach Hotel and negligently failed to warn Plaintiffs about dangers of entering the water, causing Plaintiff Milberger to be injured by a wave;

(II) Kaanapali Beach Resort Association, Inc., negligently invited and enticed Plaintiffs to the beachfront and failed to provide safety precautions for invitees causing Plaintiff Milberger's injuries;

(III) County of Maui negligently invited and enticed Plaintiffs to beachfront without providing for safety of invitees causing Plaintiff Milberger's injuries;

(IV) Defendants were grossly negligent;

(V) Defendants' negligence caused Plaintiff Olsen to lose the consortium of her fiancé, Plaintiff Milberger;

(VI) Defendants negligently inflicted emotional distress upon Plaintiff Olsen.

On October 28, 2005, all parties stipulated to dismiss with prejudice Defendant Kaanapali Beach Resort Association.

On November 29, 2006, a stipulation was submitted to dismiss all claims against the County of Maui with prejudice.

The stipulation, however, did not contain the signatures of all the parties as required by Fed. R. Civ. P. 41(a)(1).  As of today no Order has been issued to dismiss the County of Maui.

On November 14, 2006, Defendants KBHL, LLC, dba Kaanapali Beach Hotel, and C & Sea Ocean Sports, Inc., filed a Motion for Partial Summary Judgment ("Motion") to dismiss Plaintiff Olsen's claims for loss of consortium (Count V), negligent infliction of emotional distress (Count VI), and gross negligence (Count IV).  At the same time, Defendants filed a Concise Statement of Facts in Support of their Motion ("Def. CSF").

On January 4, 2007, Plaintiffs filed a Memorandum in Opposition to Defendants' Motion for Partial Summary Judgment ("Opposition") and a Separate Concise Statement of Facts in Support of their Opposition ("Pl. CSF").

On January 11, 2007, Defendant C & Sea Ocean Sports, Inc., filed a Reply Memorandum in support of the Defendants' Motion for Partial Summary Judgment ("C & Sea Reply").  On the same day, Defendant KBHL, LLC, dba Kaanapali Beach Hotel, also filed a Reply Memorandum in Support of the Defendants' Motion for Partial Summary Judgment ("KBHL Reply").

A hearing was held on January 22, 2007, on Defendants' Motion for Partial Summary Judgment.

**FACTUAL BACKGROUND**[3]

On May 2, 2003, Plaintiffs Kenneth Milberger and Heather Olsen, residents of Las Vegas, Nevada, were vacationing in Maui and were guests at the Kaanapali Beach Hotel ("KBH"). See Def. CSF Exh. "A" at ¶¶ 1, 8.  Plaintiffs utilized vouchers provided by KBH to rent snorkels, masks, and fins at C & Sea Ocean Sports.  Id. at ¶ 10.  There was a high surf advisory in effect for the waters fronting KBH, of which Plaintiffs claim they were unaware and never warned.  Id. at ¶ 11.  After he entered the water, Plaintiff Milberger was struck by a large wave and sustained injuries.  Id. at ¶ 13.  Plaintiff Olsen was present when Milberger was struck and personally witnessed the incident.  Id. at ¶ 35, Pl. CSF Exh. "2" at p. 79. Plaintiff Olsen asserts that she suffered mental and emotional injury. See Pl. CSF Exh. "2" at p. 82.

According to Plaintiffs' deposition testimony, Plaintiffs Milberger and Olsen met and began dating in early 2002.  Pl. CSF Exh. "1" at p. 49.  They became engaged to be married on February 12, 2003, but never scheduled a wedding date. See Def. CSF Exh. "C" at p. 52.  Plaintiffs had been engaged for less than three months when the accident occurred on May 2, 2003.

---

[3] The facts as recited in this Order are for the purpose of disposing of this motion and are not to be construed as findings of fact that the parties may rely on in future proceedings in this case.

See Def. CSF Exh. "B" at p. 35. Plaintiffs lived together from about March or April of 2003 until August of 2005. See Pl. CSF Exh. "2" pp. 260, 328. Prior to moving in together in early 2003, Plaintiffs opened a shared bank account. Id. at p. 53. While living together, they shared household expenses including a mortgage and childcare expenses for Milberger's daughter, Mia. Id. at p. 329. Before the incident, Milberger and Olsen had an active and fulfilling sexual relationship. After the incident, they were not able to have sex for a period of time. Id. at p. 347. Olsen asserts that after the accident, she assumed all of the household responsibilities and cared for Milberger. Id. at pp. 330-32. Olsen also says there were changes to Milberger's personality after the accident and that he became moody, cranky, and verbally abusive towards Olsen. Id. at pp. 346, 350. Following the incident, Olsen saw and was treated by a Dr. Gary Deshazo for depression and claimed that taking care of Milberger was affecting her well being. See Pl. CSF Exh. "3" at p. 3. Olsen moved out to Oregon in August of 2005. See Pl. CSF Exh. "2" at p. 260. According to Milberger, she broke off the engagement to Milberger in April of 2006; although Olsen said that she is unsure of the status of her relationship to Milberger. Def. CSF Exh. "C" at p. 56, Pl. CSF Exh. "2" at p. 114. Milberger and Olsen still communicate occasionally via the telephone. See Def. CSF Exh. "C" at p. 56, Pl. CSF Exh. "2" at p. 114.

5

## STANDARD

### I.  Motion for Summary Judgment

The purpose of summary judgment is to identify and dispose of factually unsupported claims and defenses.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Summary judgment is therefore appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56©.

"A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case.  A 'genuine issue' of material fact arises if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)) (internal citation omitted).[4]  Conversely, where the evidence could not lead a rational trier of fact to find for the nonmoving party, no genuine issue exists for trial.  See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing

---

[4]Disputes as to immaterial issues of fact do "not preclude summary judgment."  Lynn v. Sheet Metal Workers' Int'l Ass'n, 804 F.2d 1472, 1483 (9th Cir. 1986).

First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

The moving party has the burden of persuading the court as to the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323; Miller v. Glenn Miller Productions, 454 F.3d 975, 987 (9th Cir. 2006). The moving party may do so with affirmative evidence or by "'showing'--that is pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.[5]

Once the moving party satisfies its burden, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment. See Celotex, 477 U.S. 323; Matsushita Elec., 475 U.S. at 586; Cal. Arch. Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).[6] The nonmoving party must instead set forth "significant

---

[5] When the moving party bears the burden of proof at trial, that party must satisfy its burden with respect to the motion for summary judgment by coming forward with affirmative evidence that would entitle it to a directed verdict if the evidence were to go uncontroverted at trial. Miller, 454 F.3d at 987 (quoting C.A.R. Transp. Brokerage Co., Inc. v. Darden Restaurants, Inc., 213 F.3d 474, 480 (9th Cir. 2000)). When the nonmoving party bears the burden of proof at trial, the party moving for summary judgment may satisfy its burden with respect to the motion for summary judgment by pointing out to the court an absence of evidence from the nonmoving party. Miller, 454 F.3d at 987.

[6] Nor will uncorroborated allegations and "self-serving testimony" create a genuine issue of material fact. Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002); see also T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

probative evidence" in support of its position.  <u>T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987).  Summary judgment will thus be granted against a party who fails to demonstrate facts sufficient to establish an element essential to his case when that party will ultimately bear the burden of proof at trial.  <u>See</u> <u>Celotex</u>, 477 U.S. at 322.

When evaluating a motion for summary judgment, the court must construe all evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party.  <u>See</u> <u>T.W. Elec. Serv.</u>, 809 F.2d at 630-31.[7]  Accordingly, if "reasonable minds could differ as to the import of the evidence," summary judgment will be denied.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-51 (1986).

**II.  Choice of Law**

Federal courts sitting in diversity apply state substantive law and federal procedural law.  <u>Hannah v. Plumer</u>, 280 U.S. 460, 465 (1965); <u>Erie v. Tompkins</u>, 304 U.S. 64, 78 (1938).  When interpreting state law, a federal court is bound by the decisions of a state's highest court.  <u>Arizona Electric Power Coopertive, Inc. V. Berkeley</u>, 59 F.3d 988, 991 (9th Cir. 1995).  "In the absence of such a decision, a federal court must predict

---

[7]At the summary judgment stage, the court may not make credibility assessments or weigh conflicting evidence.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986); <u>Bator v. State of Hawaii</u>, 39 F.3d 1021, 1026 (9th Cir. 1994).

how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." Id. (citing In re Kirkland, 916 F.2d 1236, 1239 (9th Cir. 1990)).  Hence, the federal court is "required to ascertain from all the available data what the state law is and apply it." Soltani v. Western & Southern Life Insurance Co., 258 F.3d 1038, 1045 (9th Cir. 2001) (quoting Insurance Co. of Pennsylvania v. Associated International Insurance Co., 922 F.2d 516, 520 (9th Cir. 1990)).

## DISCUSSION

Plaintiffs Kenneth Milberger and Heather Olsen brought this action in diversity, asserting six common law tort claims against Defendants.[8]  Ms. Olsen's three claims include: (1) loss of consortium with her fiancé Kenneth Milberger, (2) negligent infliction of emotional distress ("NIED"), and (3) gross negligence.  Defendants KBHL, Inc., and C & Sea Ocean Sports, Inc., argue that Ms. Olsen has failed to state a claim upon which relief can be granted because Hawaii law does not recognize the claims for loss of consortium or NIED for an unmarried partner of

---

[8] Plaintiffs allege they were both residents of Nevada during all relevant times.  Defendants state they were business entities conducting business in the Hawaii during all relevant times. See Complaint ¶¶ 2, 3. Plaintiffs' complaint alleges damages in excess of $75,000.00.  See Complaint at ¶ 5. Parties appear to meet the requirements for diversity jurisdiction pursuant to 28 U.S.C. § 1332.

the injured party.  In addition, Defendants argue that because Plaintiff Olsen fails to state a claim for loss of consortium or NIED, she may not maintain an independent claim for gross negligence.

## I. Loss of Consortium

The Hawaii Supreme Court has recognized a common law claim for loss of consortium as derivative to the action for damages by an injured spouse.  Brown v. KFC National Management Co., 82 Haw. 226, 240-41, 921 P.2d 146,160-61 (Haw. 1996).  The loss of consortium concept encompasses damages for the loss of affection, society, companionship, and sexual relations. Mist v. Westin, 69 Haw. 192, 197, 738 P.2d 85, 89 (Haw. 1987)(citing Hopson v. St. Mary's Hospital, 176 Conn. 485, 487, 408 A.2d 260, 261 (Conn. 1979)).  The issue for summary judgment is whether, as a matter of law, Heather Olsen has standing to assert a claim for loss of consortium as an unmarried partner of Plaintiff Milberger.

Defendants argue that loss of consortium is not available for an unmarried partner of the injured party. According to the Court's research, no Hawaii state court has ruled on whether an unmarried partner can sue for loss of consortium based on an injury to the other partner.  At the hearing, the parties concurred that there is no Hawaii law directly on point. Therefore, the Court must predict how the

10

Hawaii Supreme Court would rule on the issue based on all the available data on what state law is, including decisions the Hawaii Supreme Court rendered in related cases not directly on point, decisions from other jurisdictions, statutes, treatises, and restatements as guidance.  See Soltani, 258 F.3d at 1045; Arizona Electric Power Cooperative, Inc., 59 F.3d at 988.

Plaintiffs' counsel concedes that a majority of other jurisdictions do not currently recognize standing for an unmarried partner to sue for common law loss of consortium based on an injury to the other partner.  See, e.g., Fitzsimmons v. Mini Coach of Boston, Inc., 440 Mass. 1028, 799 N.E.2d 1256 (Mass. 2003)(holding that unmarried cohabitants cannot sue for loss of consortium of injured partner); Medley v. Strong, 200 Ill. App. 3d 488, 558 N.E.2d 244 (Ill. App. Ct. 1990)(holding that a woman could not recover for loss of consortium for injury to her partner of ten years caused by medical malpractice); Elden v. Sheldon, 46 Cal. 3d 267, 758 P.2d 582 (Cal. 1988)(in bank)(barring claim for loss of consortium even though plaintiff's relationship was nearly indistinguishable from marriage). See generally 41 Am. Jur. 2d Husband & Wife § 223. Contra Loyoza v. Sanchez, 133 N.M. 579, 66 P.3d 948 (N.M. 2003)(holding that claim for loss of consortium is not limited to married partners).  Furthermore, a majority of jurisdictions do not allow recovery for loss of consortium between married couples

11

for injuries that arose prior to marriage. See, e.g., Trombley v. Starr-Wood Cardiac Group, PC, 3 P.3d 916 (Alaska 2000) (holding that Plaintiff could not recover for loss of consortium of her current husband where she was still legally married to her first husband at time of the injury); Gurliacci v. Mayer, 218 Conn. 531, 590 A.2d 914 (Conn. 1991)(holding that an action for loss of consortium cannot be maintained unless the person was married to the injured spouse at the time of the injury); Tremblay v. Carter, 390 So. 2d 816 (Fla. Dist. Ct. App. 1980)(holding that a wife could not recover for loss of consortium of her husband where injuries occurred prior to marriage).  See generally Charles Plovanich, Annotation, *Recovery for Loss of Consortium for Injury Occurring Prior to Marriage*, 5 A.L.R. 4th 300 (1981).

In addition to the case law, the Restatement of Torts, Second, suggests that loss of consortium claims are limited to married couples. Restatement (Second) of Torts § 693 cmt. h (1977)(stating that claims for loss of consortium are available to "parties of a valid marriage").

Plaintiffs argue that notwithstanding the majority's reasoning, two Hawaii cases show that the Hawaii Supreme Court would allow Ms. Olsen's claim.  The first is Masaki v. General Motors Corp., 71 Haw. 1, 780 P.2d 566 (Haw. 1989).  The Masaki court broke with the majority of jurisdictions when it recognized a parent's loss of consortium claim for an injured adult child,

12

reasoning that the societal notion of the value of children had shifted from services to companionship in modern times. Id. at 21, 780 P.2d at 577.

Nevertheless, recognition of filial consortium for adult children does not equate to recognition of loss of spousal consortium for unmarried partners.  The rights and duties accorded to parents and children are supported by different policy and social concerns than those underlying marriage. Notably, since Masaki the Hawaii legislature has been very deliberate when it has considered whether and to whom the rights and duties of marriage should accrue.  The legislature passed the Reciprocal Beneficiaries Act in 1997, granting persons who are legally prohibited from marrying the ability to register as reciprocal beneficiaries and obtain certain rights associated with marriage.  Haw. Rev. Stat. § 572C (Supp. 2005).  The findings under the Act state,

> The legislature finds that the people of Hawaii choose to preserve the tradition of marriage as a unique social institution based upon the committed union of one man and one woman.  The legislature further finds that because of its unique status, marriage provides access to a multiplicity of rights and benefits throughout our laws that are contingent upon that status.

Haw. Rev. Stat. § 572C-2 (emphasis added).  This special

attention to the "unique status" of marriage underscores the need for additional caution when granting rights contingent upon marriage to unmarried partners.

Plaintiffs also cite <u>Lealaimatafao v. Woodward-Clyde Consultants</u>, in which the court held that a decedent's "non-legal wife" and her son could sue for loss of consortium under Hawaii's wrongful death statute.  75 Haw. 544, 553, 867 P.2d 220, 224 (Haw. 1994).  The court ruled,

> "In their complaint, both Appellants averred that they were wholly dependent on [the decedent].  Appellants also averred that [the decedent] had been residing with them since 1973 and held them out as his wife and son.  Thus, Appellants' complaint contains allegations, which if proven, are sufficient to entitle them to recover for loss of love and affection."

<u>Id.</u> at 553. The Court notes that in <u>Lealaimatafao</u> it was alleged that the plaintiff and her deceased partner had lived together as a family and "held [each other] out" as husband and wife for 16 years.  <u>Id.</u> at 548.  As recited above, the Hawaii Supreme Court specifically observed that the complaint alleged that the plaintiff's deceased partner had held her out as his wife.  On the other hand, Ms. Olsen and Mr. Milberger had been engaged for less than 3 months at the time of the injury, and with no wedding date having been set.  <u>See</u> Def. CSF Exh. "B" at p. 35.  Moreover,

unlike the case at bar, the plaintiff in Lealaimatafao was suing for loss of love and affection under the wrongful death statute. Haw. Rev. Stat. § 663-3 (Supp. 2005).  The statute authorizes claims brought by: "the surviving spouse, reciprocal beneficiary, children, father, mother, and by any person wholly or partly dependent upon the deceased person." Id.  In Masaki the court looked to the wrongful death statute to determine whether the plaintiffs had standing to sue for common law loss of consortium based on the injury of their adult son.  Plaintiffs argue that this Court should also look to the wrongful death statute to determine whether Ms. Olsen, like Ms. Lealaimatafao, has standing for her common law claim because she was wholly or partly dependent upon Mr. Milberger.  While the wrongful death statute gives standing to "anyone wholly or partly dependent" on a deceased, there is no analogous open-ended class of dependent plaintiffs who can bring a claim for loss of consortium under the common law scheme. § 663-3. Such a dramatic expansion of the class of potential claimants is better left to the state courts or the legislature.

Judicial rejection of common law marriage militates against extending rights traditionally reserved for married couples to unmarried partners.  This Court echoes Judge Fong's opinion in Kiesel v. Peter Kiewit & Sons Co., 638 F. Supp. 1251 (D. Haw. 1986).  Although the case was decided upon federal

maritime law, Judge Fong noted his unwillingness to recognize a claim for loss of consortium for a common law wife under Hawaii law, stating, "Where the Legislature has spoken, even if only by refusing to recognize common law marriage in Hawaii, this court will not impose a contrary result." Id. at 1254. More recently, the Hawaii Supreme Court reiterated the state's rejection of common law marriage in Tabieros v. Clark Equipment Co., 85 Haw. 336, 348 n.2, 944 P.2d 1279, 1291 n.2 (Haw. 1997).  Elden articulates a major policy concern that justifies treating formally married and unmarried couples differently: "Formally married couples are granted significant rights and bear important responsibilities toward one another which are not shared by those who cohabit without marriage." 46 Cal. 3d at 275, 758 P.2d at 587.  This distinction is one reason courts and legislatures have abolished common law marriage. Id. Plaintiffs have not presented a persuasive reason why this Court should countermand the state's rejection of common law marriage to permit an unmarried couple in the Plaintiffs' position to recover to the same extent as married couples.

Importantly, the Hawaii legislature has articulated a strong interest in reserving for itself the task of defining and articulating policy judgments with regard to who may receive the rights associated with marriage. The doctrine of separation of powers states that while the judiciary interprets the law, it is

16

up to the legislature to make decisions about the wisdom of adopting certain policies.  The Hawaii Supreme Court acknowledged the need for judicial restraint in certain circumstances when it stated, "We should recognize that, although courts, at times, in arriving at decisions have taken into consideration social needs and policy, it is the paramount role of the legislature as a coordinate branch of our government to meet the needs and demands of changing times and legislate accordingly." Bissen v. Fujii, 51 Haw. 636, 638, 466 P.2d 429, 431 (Haw. 1970).

Few areas are more driven by concerns of social needs and policy than defining the requirements and classes of persons who may access the rights and obligations of marriage.  In 1994, the legislature amended the marriage licensing statute to clarify the Legislature's intention that marriage should be limited to those of the opposite sex. Act of June 22, 1994, No. 217, 1994 Haw. Sess. Laws 526 (codified as amended at Haw. Rev. Stat. § 572-1).[9]  The Senate's committee report for the predecessor bill

---

[9] The Hawaii legislature engaged in a flurry of debate and discussion about marriage in response to the Baehr v. Lewin decision, in which the Hawaii Supreme Court held that Hawaii's marriage licensing statute limiting marriage to those of the opposite sex violated the same-sex applicants' rights to equal protection under the Hawaii Constitution. 74 Haw. 530, 580, 852 P.2d 44, 67 (Haw. 1993). The 1994 amendment to the State's marriage licensing statute was the first of several legislative actions taken to address the issue of same-sex marriage, culminating in 1997 with the passage and ratification of an amendment to the Hawaii State Constitution that allows the legislature to have the power to reserve marriage for opposite-sex couples. Haw. Const. art. I, § 23. The marriage licensing

17

emphasized its separation of powers concerns with regard to marriage:

> Since the determination of the nature of the marital relationship, together with its rights and benefits, falls more appropriately within the province of the legislature as one of policy, your Committee believes that this issue is more properly dealt with in the legislative rather than the judicial forum.  Under the principle of separation of powers, your Committee finds that the court therefore should have deferred to the legislature in its determination and interpretation of the marriage licensing laws.

S. 17-2777, Reg. Sess., at 1101 (Haw. 1994).  Especially, as here, where no Hawaii case law or statute directly resolves the issue of whether an unmarried partner has standing to bring a common law loss of consortium claim, this Court is reluctant to create new substantive rights for this class of persons.  The extension of rights traditionally accorded only to those who are married is exactly the type of decision that implicates the

---

statute, limiting marriage licenses to couples of the opposite sex, was thus validated. See generally David Orgon Coolidge, *The Hawai`i Marriage Amendment: Its Origins, Meaning and Fate*. 22 U. Haw. L. Rev. 19, 109-10 (2000)(discussing the unpublished ruling of the Hawaii Supreme Court, dismissing the Baehr plaintiffs' claims as moot in light of the passage of the Hawaii Marriage Amendment, Baehr v. Miike, No. 20371 (Haw. Dec. 9, 1999)). During the 1997 session, the legislature also debated and passed the Reciprocal Beneficiaries Act.  H.B. 118, 19th Leg., Reg. Sess. (Haw. 1997)(codified at Haw. Rev. Stat. § 572C).

principle of separation of powers.  Such action strays too far into the legislature's law-making prerogative.

If the legislature intended to extend benefits and rights to unmarried partners in the Plaintiffs' position, it could have done so when it drafted the Reciprocal Beneficiaries Act.  As noted earlier, the Act gives reciprocal beneficiaries certain rights and benefits that had been historically reserved for married couples.[10]  To qualify as reciprocal beneficiaries, individuals must be at least eighteen years old, neither party may be married or party to another reciprocal beneficiary relationship, the parties must be legally prohibited from marrying one another, and both parties must give valid consent.  Haw. Rev. Stat. § 572C-4.  Furthermore, the parties must register their signed declaration with the Director of Health.  Id. at § 572C-5.  The Act expressly creates a new class of persons to whom these rights will be granted, including the right to sue for wrongful death.  The legislature also contemplated pairings other than same-sex couples because the statute is written to cover anyone who is legally precluded from marrying, including, for example, "a widowed mother and her unmarried son." Id. at § 572C-2.  Opposite-sex couples who are engaged to be married or

---

[10] These rights include, generally: survivorship rights, health-related and hospital visitation benefits, benefits relating to jointly held property, legal standing for wrongful death and other victims' rights, and other miscellaneous benefits. See S. 19-2, Reg. Sess., at 851 (1997) (Conf. Rep.).

cohabit, however, were specifically excluded from this new class
because they are entitled to marry.  Unlike reciprocal
beneficiaries, couples who become engaged do not have to register
with the state or meet any criteria to obtain their status as
betrothed.  When the legislature created the class of reciprocal
beneficiaries, it could have defined the class to include couples
who are engaged to be married or cohabiting, but it declined to
do so.[11]  It is apparent that the legislature did not intend to
extend rights to unmarried partners who are not eligible for
reciprocal beneficiary status.  Nor did the legislature extend
rights under the wrongful death statute to same-sex partners who
are cohabiting but have not registered with the state.

        The Court notes that <u>Lealaimatafao</u> was decided in
January of 1994, before the legislature's criticism of the Hawaii
Supreme Court's decision in <u>Baehr</u> as improperly intruding on the
legislature's constitutional role, before <u>Tabieros</u> reiterated
Hawaii's rejection of common law marriage in September of 1997,
and before the legislature created the reciprocal beneficiary

_____

        [11] The recent introduction of the bills to recognize civil
unions in Hawaii does not change this analysis. S.B. 1062, 24th
Leg., Reg. Sess. (Haw. 2007); H.B. 907, 24th Leg., Reg. Sess.
(Haw. 2007); H.B. 908, 24th Leg., Reg. Sess. (Haw. 2007). To the
contrary, the bills underscore the legislature's wishes to
reserve for itself the task of defining which classes of persons
may receive the rights of marriage.  Moreover, the civil union
bills reiterate the strong intent of the legislature that the
union or relationship must be formalized by the partners
registering with the state in order to qualify for such marital
rights.

status in 1997. Taken together, the legislature's strongly worded assertion that courts should leave to the legislature the task of defining who may obtain the rights associated with marriage and the legislature's addition of duly registered reciprocal beneficiaries to the class of those eligible to bring a wrongful death action, persuade this Court that the Hawaii Supreme Court would feel restrained from finding that there is a common law right to loss of consortium for unmarried partners.[12]

For all the foregoing reasons, the Court concludes that Hawaii law denies an unmarried partner standing to bring a common law loss of consortium claim based upon a severe injury to the other partner. The Court GRANTS Defendants' Motion for Summary Judgment as to Count (V) Loss of Consortium.

## II.  Negligent Infliction of Emotional Distress

The Hawaii Supreme Court recognized a claim by a bystander for negligent infliction of emotional distress ("NIED") in Leong v. Takasaki, 55 Haw. 398, 411, 520 P.2d 758, 766 (Haw. 1974), which held that a boy could make a claim for NIED after witnessing his step-grandmother be killed by an automobile.  The

---

[12] In Kiesel, Judge Fong similarly opined that he did not believe that Hawaii would recognize loss of consortium for a "spouse-like relationship," saying, "the fact that the Legislature and the courts have given some rights to a person in Mrs. Kiesel's position does not necessarily suggest that Hawaii is prepared to extend the additional right-recovery for loss of consortium–to an unmarried person, solely to protect 'relational interests.'" Kiesel, 638 F. Supp. at 1254.

general rule is that the court will impose liability "when it is reasonably foreseeable that a reasonable plaintiff-witness to an accident would not be able to cope with the mental stress engendered by such circumstances." Id. at 410. In Hawaii, no physical contact with the bystander or physical manifestation of emotional distress is required to assert a NIED claim. Id. In addition, the bystander need not be present or personally witness the incident to recover. See e.g., First Insurance Co. of Hawai`i, Ltd. v. Lawrence, 77 Haw. 2, 9, 881 P.2d 489, 496 (Haw. 1994) (finding that absence of physical injury and non-witnessing of accident do not bar to recovery for NIED but are factors in determining the degree of emotional distress suffered).

One of the factors for assessing foreseeability is the degree of closeness in the relationship between the injured party and the plaintiff alleging NIED. Leong, 55 Haw. at 408-410, 520 P.2d at 765 (discussing the three factor test of foreseeability from Dillon v. Legg, 68 Cal. 2d 728, 441 P.2d 912 (Cal. 1968)).[13] The issue in this case is whether an unmarried partner is

---

[13] Dillon puts forth three factors to assess foreseeability: (1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship. Dillon, 68 Cal. 2d at 740-41, 441 P.2d at 920.

"closely related" enough to give rise to a cognizable claim for negligent infliction of emotional distress.  Like loss of consortium, the Hawaii Supreme Court has not ruled on whether an unmarried partner may bring a claim for negligent infliction of emotional distress.

Defendants have asserted and Plaintiffs conceded at the hearing that a majority of courts would not allow a claim by a fiancé or unmarried partner for NIED. <u>See</u>, <u>e.g.</u>, <u>Grotts v. Zahner</u>, 115 Nev. 339, 989 P.2d 415 (Nev. 1999)(holding that a fiancé lacks standing to bring a claim for NIED); <u>Lindsey v. Visitec, Inc.</u>, 804 F. Supp. 1340 (D. Wash. 1992)(holding that under Washington law, a fiancee who had been living with deceased for one year was not entitled to bring claim for NIED); <u>contra Graves v. Estabrook</u>, 149 N.H. 202, 818 A.2d 1255 (N.H. 2003)(allowing recovery for a woman who witnessed her fiancé killed in a motorcycle accident after living together for seven years); <u>Dunphy v. Gregor</u>, 136 N.J. 99, 642 A.2d 372 (N.J. 1994)(allowing recovery for fiancee who had been engaged to deceased for two-and-a-half years and cohabitated for the same period of time).

Plaintiffs argue that <u>Leong</u> is the operative case and demonstrates the Hawaii Supreme Court's willingness to look beyond the traditional blood-relationship requirement when assessing who may sue for negligent infliction of emotional

distress.  55 Haw. at 410, 520 P.2d at 766.  Leong can be distinguished, however, because the court's reasoning was based upon a recognition of an established cultural tradition in Hawaii of informal extensions of the nuclear family.  As the Court stated earlier with regard to Masaki, extending the rights associated with family relationships between parents or grandparents and their issue invokes different policy concerns than extending the rights of marriage.  As a result, the reasoning of Leong is not wholly applicable when the Plaintiffs ask to extend marital rights to unmarried persons.  The doctrine of separation of powers restrains the Court from deciding the policy-driven question of who may receive rights traditionally reserved to married couples.

This Court shares the concern of other jurisdictions about the need to limit the number of persons to whom a negligent defendant owes a duty of care in NIED cases where the intangible nature of the loss exposes the Defendant to risks of limitless liability.  See, e.g., Biercevicz v. Liberty Mutual Insurance Co., 49 Conn. Supp. 175, 183, 865 A.2d 1267, 1272 (Conn. Super. Ct. 2004)(holding that a fiancee is not closely related for the purposes of NIED, relying in part on the need to "avoid countless other litigants and extend liability on the part of negligent defendants."), Sollars v. City of Albuquerque, 794 F. Supp. 360, 363 (D.N.M. 1992) (declining to allow an unmarried cohabitant to

recover for NIED under New Mexico law because "to do so would result in the unreasonable extension of the scope of liability of a negligent actor.")

If the line is not drawn at married persons, it is unclear what types of unmarried partners could bring claims. It may be difficult to make meaningful distinctions between the numerous permutations that exist, whether it includes engaged cohabitants, engaged non-cohabitants, non-engaged cohabitants, or partners who neither live together nor are engaged but share other emotional or economic ties such as a child or a joint bank account. Unlike married persons or duly registered reciprocal beneficiaries, this class is amorphous and difficult to define. The Court acknowledges that an unmarried partner can have an equally substantial risk of sustaining emotional distress as a legal spouse and also that unmarried cohabitation is increasingly common.[14] As with its creation of reciprocal beneficiaries, the legislature could at some point consider extending additional rights and benefits to unmarried couples. Still, many jurisdictions have declined to extend standing beyond marriage, in part, because of the important interest in defining a discrete class of potential plaintiffs. See, e.g., Elden, 46 Cal. 3d at

---

[14] The Elden court noted that the incidence of unmarried couple households nearly tripled between 1970 and 1984. 46 Cal. 3d at n.3 (citing U.S. Dept. Of Commerce, Current Population Reports (1984) Population Characteristics, series P-20, No. 399, Marital Status and Living Arrangements: Mar. 1984 at p.7.)

25

276-77, 758 P.2d at 588.[15]  The sheer variety and diversity of relationship configurations that couples occupy makes extending NIED to this class difficult to administer.  Prudence advises against embarking on a path that would mire courts in the intrusive and undesirable task of inquiring into the minute and intimate details of a relationship to assess its "closeness." Accordingly, the Court declines to extend a right of action for negligent infliction of emotional distress to a bystander whose unmarried partner was severely injured.

For all the foregoing reasons, the Court concludes that under Hawaii law, Plaintiff Olsen has failed to state a claim for negligent infliction of emotional distress.  Accordingly, the Court GRANTS Defendants' Motion for Summary Judgment as to Count (VI) Negligent Infliction of Emotional Distress.

**III. Gross Negligence**

---

[15]  Elden quotes Dean Prosser to support the need for limits on potential claimants for NIED:

> [I]f recovery [for mental distress] is to be permitted, there must be some limitation. It would be an entirely unreasonable burden on all human activity if the defendant who has endangered one man were to be compelled to pay for the lacerated feelings of every other person disturbed by reason of it, including every bystander shocked at an accident, and every distant relative of the person injured, as well as his friends. And obviously the danger of fictitious claims, and the necessity of some guarantee of genuineness, are even greater here than before.

Elden, 46 Cal.3d at 276, 758 P.2d at 588 (quoting Prosser, LAW OF TORTS (3d ed. 1964) § 55, pp. 353-354).

In Count IV, Plaintiffs' Complaint asserts a claim entitled "gross negligence", but in fact in Count IV the Plaintiff Olsen is only seeking punitive damages.  A claim for punitive damages is incidental to a separate cause of action and not an independent claim. <u>See</u>, <u>e.g.</u>, <u>Ross v. Stouffer Hotel Co.</u>, 76 Haw. 454, 466, 879 P.2d 1037, 1049 (Haw. 1994).  At the hearing, Plaintiffs' counsel agreed to dismiss the claim for gross negligence as to Ms. Olsen, with leave to seek punitive damages as part of the damages sought for her other substantive claims.  Plaintiff Olsen, however, has failed to make an independent claim for loss of consortium or negligent infliction of emotional distress for the reasons stated above.

Accordingly, the Court DISMISSES Plaintiff Olsen's claim under Count (IV) for gross negligence.

## **CONCLUSION**

For the foregoing reasons, the Court GRANTS Defendants' Partial Motion for Summary Judgment as to Counts (V) loss of consortium and (VI) negligent infliction of emotional distress. The Court DISMISSES Count (IV) gross negligence as to Plaintiff Olsen.

As to Count (V) the Court concludes that Hawaii law does not recognize standing for an unmarried partner to bring a common law loss of consortium claim based upon a severe injury to the other partner.

As to Count (VI) the Court concludes that Hawaii law precludes an unmarried partner from bringing a claim for negligent infliction of emotional distress.

As to Count (IV), the claim for gross negligence is dismissed as to Plaintiff Olsen.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, February 22, 2007.



Alan C. Kay
Sr. United States District Judge

MILBERGER et al., v. KBHL, LLC, dba KAANAPALI BEACH HOTEL, et al., Civ. No. 05-00297 ACK/KSC, ORDER GRANTING DEFENDANTS' PARTIAL MOTION FOR SUMMARY JUDGMENT.